UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

V. LYNN OTERO,

    Debtor.                                                     Case No. 7-98-14677-R

V. LYNN OTERO,

    Plaintiff,

v.                                                                       Adv. No. 12-1309-T

GREEN TREE SERVICING, LLC,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court after trial on the merits on Plaintiff's claim that Defendant violated the discharge injunction. For the reasons set forth below, the Court rules in Plaintiff's favor and finds that a sanction or damages award of $15,951 is appropriate.

### I.     FACTS

The Court finds that the following facts:

1.     Plaintiff resides in New Mexico and is the debtor in the above-captioned, discharged, Chapter 7 bankruptcy case.

2.     Defendant is a foreign corporation transacting business in New Mexico.

3.     Plaintiff purchased a mobile home in 1997, and financed the purchase with a loan from Bank of America (the "Loan").

4.     Plaintiff filed the above-captioned bankruptcy case on July 29, 1998, and listed Bank of America as a creditor.

5.     An order discharging Plaintiff was entered November 4, 1998.

6. Plaintiff's bankruptcy case was closed November 4, 1998.

7. Plaintiff lived in the mobile home until 2002.

8. Plaintiff is relatively unsophisticated, with a 9th Grade education and somewhat limited literacy.

9. For some reason, Plaintiff decided to keep the mobile home after she moved out, rather than surrender it to Defendant. The Court does not know why Plaintiff elected that course of action, but it was her decision to make. Defendant had no duty to explain to Plaintiff that surrendering the mobile home likely was more prudent.

10. In or about 2004, Defendant took over servicing the Loan.

11. Defendant first contacted Plaintiff in writing in 2005, sending her a "Monthly Informational Statement."

12. Defendant sent Plaintiff at least ten such statements between 2005 and 2012.

13. Defendant first contacted Plaintiff by telephone in 2004. Between 2004 and 2010, telephone contact was sporadic and relatively infrequent.

14. Defendant's procedures manual provides:

*When contacting a post discharge non-reaffirmed debtor or their attorney:*

- *Contact them only ONCE a month to ask whether the debtor wishes to retain or surrender the collateral*
- *Follow scripting in Figure #3 below, as appropriate.*

*Figure #3-Script for Discussion with Post Discharge Non-Reaffirmed Debtors*

| If debtor or Their Attorney Says | Account Representative Says |
|---|---|
| Why are you calling? | We are calling to determine your intent with the collateral. We are not attempting to collect the debt. Do you intend to retain or surrender the collateral? |
| Intent is to surrender collateral | Do you agree to voluntarily surrender the collateral? What is the condition of the collateral? Where is the |

-2-

| | |
|---|---|
| | *collateral located?*<br><br>*Note: Any informational statements must be stopped. Do not use voluntary surrender forms that indicate the debtor may be liable for any deficiency. If the debtor does not cooperate in a voluntary surrender, proceed directly to repossession or foreclosure.* |
| *Intent is to retain the collateral and make voluntary payments* | *Your personal obligation to repay this debt was discharged and you are not obligated to make any payment on the debt. Green Tree's security interest in the property securing the debt, however, survives the discharge. As long as Green Tree receives the amounts due according to the terms of the security agreement, Green Tree will take no action to obtain possession of the collateral. You may retain it or you may redeem the property by paying its fair market value in one lump sum. For your convenience, informational statements will be (or are being) sent to you reminding you of the terms of the security agreement. Again, you are under no obligation to pay any amount to Green Tree and any payment you do make is voluntary.*<br><br>*Note: North Carolina accounts do not receive informational statements.* |
| *Intent is to make lump sum payment in full (redeem)* | *Performing loans should be transferred to Customer Service for Payoff Quotes. Foreclosure loans should be sent to the Foreclosure Department for Payoff.* |
| *Would like to discuss modification options that could lower the monthly payment* | *We have a range of modification options available; however, I need to gather some budget information from you in order to determine which modification will best suit your current situation. Do you have a few minutes to answer some questions?*<br><br>*Note: If answer is yes, use the Financial Analysis Worksheet and proceed as outlined in the appropriate section below:*<br>• *Financial Analysis Worksheet, APP-012*<br>• *Short Term Rate Modification, Section 430*<br>• *Permanent Rate Modification, Section 435* |
| *Don't call again.* | *I'm sorry to bother you. I'll make sure to note this request on our records. Note: Follow procedures shown in COLLECTION CONDUCT, Contact-Cease and Desist Requests, Section 106* |

15. The volume of collection calls increased in 2011. Of Defendant's 46-page "Collection Comment List" for Plaintiff (the "collection log"), 38 pages are devoted to calls and other activity between January 1, 2011 and November 7, 2012. 25 pages of the collection log relate to activity in the first 11 months of 2012.

16. Defendant's collection log contains about 19 pages of notes per year for the last two years, in contrast to about one page of notes per year between 2004 and 2010. Using this metric, collection activity increased by a factor of nearly 20 after 2010.

17. In 2012, the collection log indicates the following:

| Month | Number of calls from Defendant | Number of messages left | Who Defendant called |
|---|---|---|---|
| January | 0 | 0 | |
| February | 12 | 7 | Plaintiff; sister |
| March | 3 | 1 | Plaintiff |
| April | 9 | 2 | Plaintiff; granddaughter Destiny |
| May | 8 | 5 | Plaintiff; sister; Destiny |
| June | 6 | 2 | Plaintiff |
| July | 11 | 0 | Plaintiff; Destiny |
| August | 19 | 4 | Plaintiff |
| September | 3 | | Plaintiff |
| October | 134 | 34 | Plaintiff; Mr. Henderson; Linda Manzanares; Ermina Manzanares; Destiny; Martha; David; Jessi; William Bailey; Leroy Montoya; Olga Esparza |
| November 1-7 | 11 | 5 | Plaintiff |
| Total | 216 | 60 | |

-4-

18. In October, 2012, Defendant apparently was unable to confirm to its satisfaction that Plaintiff wished to continue to retain the mobile home. Further, Plaintiff was behind on the "voluntary" monthly payments. Rather than exercise its state law rights with respect to the mobile home, however, Defendant began a campaign of harassing telephone calls, including 134 total telephone calls during the month, made to Plaintiff and her friends, relatives, and neighbors. Defendant made 29 calls on October 30, 2012, and made 41 additional calls the next day.[1]

19. The telephone campaign involved skip tracing. This entry from October 30, 2012 (one of eight entries made that day) illustrates this fact:

> Attempted Contact OTERO LYNN, Connected to: 5059072946, Origin of Contact: Outbound, OUTCOME: NA, FOLLOW-UP DATE: 10/31/2012, SKIP (505) 818 3058 NML, (505) 369-1151 N/A, (505) 907-2946 NML, **SKIP F/D NEIGHBOR WILLIAM BAILEY @35 505-452-0606 FAST BUSY, LEROY MONTOYA @2 505-872-4418 FAST BUSY, TAWNI HENDERSON @42 505-452-0334 N/A, OLGA ESPARZA @69 505-717-2546 There was no answer[2]

20. Defendant could easily have written a letter, and/or left a voicemail message, informing Plaintiff that if the past due voluntary payments were not made by a certain date, Defendant would exercise its rights under its security interest.[3] Defendant chose instead to conduct the harassing telephone campaign described above.

21. Plaintiff testified that some of the telephone calls she received were unpleasant and forceful, and stated or implied that she was "responsible" for the payments being demanded,

---

[1] Defendant's calls on October 30, 2012 were to 13 telephone numbers. One number (Plaintiff's cell number) was called eight times. Another number was called seven times. The cell phone number for Plaintiff's 12-year old granddaughter, Destiny Otero, was called three times. On October 31, 2012, Defendant again called 13 telephone numbers, some different from the October 30 list. Defendant called Plaintiff's cell number 11 times, another number 11 times, and Destiny's number 7 times.

[2] Based on trial testimony of Defendant's representative, the Court understands that: N/A means no answer; Outbound means that Defendant placed the call; and NML means no message left.

[3] In fact, Defendant sent a notice of default and right to cure letter on November 2, 2012, after Defendant received a "cease and desist" letter from Plaintiff's counsel.

-5-

and was obligated to make them. In light of the other evidence in the record, the Court finds this testimony credible.[4]

22. Plaintiff testified that she asked Defendant not to call her back. Although the details of this request are unclear (i.e. how many times was such a request made, how forcefully, and to whom), the Court finds that Plaintiff did make such a request several times, and Defendant ignored it.[5]

23. Plaintiff testified that she suffers from osteoporosis, fibromyalgia, high blood pressure, and depression, and that the stress caused by Defendant's repeated telephone calls made her medical conditions worse. Plaintiff did not attempt to quantify any damage she suffered because of the stress, however (for example, no medical professional testified, no medical bills were entered into evidence, and there was no testimony about out-of-pocket, lost work, or other damages). Based on this lack of evidence, the Court cannot make a finding quantifying Plaintiff's damages for pain and suffering, medical expenses, or the like.

24. Plaintiff's other evidence of actual damages relates to four or five payments she testified she made to Defendant. There is no evidence when most of these payments were made, e.g. whether before or after January 1, 2011. However, Defendant's "Monthly Informational

---

[4] Not all of Plaintiff's testimony was credible. Defendant's counsel was able to impeach some of Plaintiff's trial testimony with prior inconsistent deposition testimony. For example, at trial Plaintiff testified that on several occasions she told Defendant to pick up the mobile home. During her deposition, on the other hand, she testified that she never told Defendant to pick up the mobile home. This is a serious inconsistency. Because of that, the Court has relied for the most part on the written evidence in the record (primarily Defendant's collection log) and the portions of Plaintiff's testimony what were both unimpeached and consistent with the written evidence.

[5] *See, e.g,, t*he following entry in Defendant's collection log was made April 11, 2012:

> BOR STD THT SHE DOESN'T WNT JANET TO EVER CALL HER, ASKED FOR INTENT SHE STD THE BNKRUPTCY IS SUPPOSED TO PROTECT HER, ASK FOR HER EXPLAIN THTS WHY WE ARE ASKING FOR INTENT AND PERMISSION TO CALL BK WOULDN'T ANSWR QUESTION LINE DISCO, NEVER GOT ANSWR FOR INTENT OR PERMISSION.

-6-

Statement" dated September 6, 2012 reflects a $251 payment from Plaintiff received August 21, 2012.

  25. Plaintiff's counsel wrote cease and desist letters to Defendant and affiliates on October 24, 2012. Defendant's affiliate Green Tree Insurance Agency received one of the letters no later than October 30, 2012, as evidenced by its October 30, 2012 response. It is not clear that Defendant was on notice by October 30, 2012, although it seems likely.

  26. In any event, on November 5, 2012 the following notation appears in the collection log:

    RCVD DATTY LTR RE C&D; IN NIS; SET C&D FLAG

  27. Despite setting the cease and desist flag on November 5, 2013, over the next two days a collector called the cell phone of Plaintiff's 12 year old granddaughter three times, leaving two voicemail messages.

  28. Plaintiff incurred attorney fees of $5,699.49 pursuing this matter.

## II. DISCUSSION

### A. CLAIMS FOR VIOLATION OF THE DISCHARGE INJUNCTION.

  1. <u>Section 524(a)(2)</u>. Section 524(a)(2) provides that a bankruptcy discharge:

> operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

The "such debt" is a reference to the language in § 524(a)(1) about "any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title . . . ."

  2. <u>No Private Right of Action</u>. There is no controlling Tenth Circuit

-7-

authority addressing whether debtors injured by a violation of 11 U.S.C. §524(a)(2) have a private right of action for damages. Other circuits addressing the issue have held that no such private right of action exists. *See Walls v. Wells Fargo Bank,* 276 F.3d 502, 508 (9th Cir. 2002); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 422-23 (6th Cir. 2000); *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 917 (7th Cir. 2001). *See also Bessette v. Avco Financial Services*, 230 F.3d 439, 444 (1st Cir. 2000).

In *Paul v. Inglehart (In re Paul)*, 534 F.3d 1303 (10th Cir. 2008), the Tenth Circuit cited *Walls*, *Bessette*, and *Cox* when discussing a bankruptcy court's power to remedy violations of § 524(a)(2) by sanctioning creditors pursuant to the court's contempt powers. 534 F.3d at 1306-07. The implication in *Paul* is that the Tenth Circuit likely would follow the 1st, 6th, 7th, and 9th Circuits in holding that there is no private right of action. Based on *Paul* and the other case law, the Court holds that § 524(a)(2) does not confer a private right of action upon debtors in cases of violation of the discharge injunction.

        3.     <u>The Appropriate Remedy is a Contempt Order</u>. The lack of a private right of action does not leave debtors without a remedy. The Tenth Circuit has made clear that a debtor may file a motion to sanction a creditor for violating § 524(a)(2), pursuant to the Court's civil contempt powers derived from 11 U.S.C. § 105. *Paul*, 534 F.2d at 1306-07. This is the generally recognized remedy. *See Bessette*, 230 F.3d at 445 (citing lower court cases); *Walls*, 276 F.3d at 509; and *Cox*, 239 F.3d at 917. *Cf. Pertuso*, 233 F.3d at 423. The Court will apply the *Paul* holding here.

        4.     <u>Burden of Proof</u>. Plaintiff has the burden of proving a violation of the discharge injunction by clear and convincing evidence. *In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006); *In re Al-Jiboury,* 344 B.R. 218, 225 (Bankr. D. Mass. 2006); *Musslewhite v. O'Quinn*

*(In re Musslewhite),* 270 B.R. 72, 79 (S.D. Tex. 2000). *See generally Reliance Ins. Co. v. Mast Const. Co.,* 159 F.3d 1311, 1315 (10th Cir. 1998) (to prevail in a civil contempt proceeding, plaintiff must prove elements by clear and convincing evidence). "[T]he movant must prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction." *Zilog,* 450 F.3d at 1007, citing *Renwick v. Bennett (In re Bennett),* 298 F.3d 1059, 1072 (9th Cir. 2002).

> 5. <u>Claims For Violation of the Discharge Injunction May Be Brought as Adversary Proceedings Rather than Contested Matters</u>. Proceedings to find a party in contempt of court generally are brought as contested matters, rather than adversary proceedings. *See, e.g., In re Whitaker,* 2013 WL 2467932, at *4 (Bankr. E.D. Tenn. 2013) (collecting cases). Nevertheless, most courts have allowed debtors to raise the issue via adversary proceeding. *Id. See also Montano v. First Light Federal Credit Union (In re Montano)*, 398 B.R. 47, 55 (Bankr. D.N.M. 2008) (Starzynski, J). The rationale is that adversary proceedings provide more procedural and other safeguards to defendants than contested matters. If faced with the issue, this Court likely would rule that filing an adversary proceeding is an acceptable, albeit perhaps not preferable, way to proceed. The Court need not address the issue here, however, because Defendant did not raise it.

> 6. <u>Collection Calls Violate the Discharge Injunction</u>. Dunning telephone calls to collect discharged debts clearly are "act[s], to collect" such debts, and therefore violate the discharge injunction. 11 U.S.C. § 524(a)(2). *See Montano, et al. v. First Light Federal Credit Union (In re Montano),* 488 B.R. 695, 708 (Bankr. D.N.M. 2013); *Walton v. Clark & Washington, P.C.,* 454 B.R. 537, 545 (Bankr. M.D. Fla. 2011) (collection calls to get drawer of post-dated check to honor the check violated the discharge injunction). There is no need to

conduct an "objective inquiry" into whether collection calls are prohibited by the discharge injunction, s*ee In re Paul,* 534 F.3d at 1307 (actions that are "facially permissible" may nevertheless violate the discharge injunction if, viewed objectively, the creditor coerced or harassed the debtor improperly so as to obtain payment of a discharged debt), because dunning calls are facially impermissible.

B.  DEFENDANT'S COLLECTION ACTIVITY IN 2011 AND/OR 2012 VIOLATED THE DISCHARGE INJUNCTION.

Defendant's collection efforts went over the line of permissible activity at some point after January 1, 2011, and became willful violations of the discharge injunction. Defendant's only argument in defense is that its telephone campaign was initiated to determine Plaintiff's "intent" with respect to the mobile home, and/or to enforce Defendant's security interest in the mobile home. At some point, this position loses plausibility. There were much easier, less coercive ways to determine Plaintiff's intent and enforce Defendant's lien rights. For example, calls were only needed if Plaintiff was late on a "voluntary" monthly payment. If Plaintiff was late, it would have been permissible for Defendant to make reasonable efforts to determine if Plaintiff had changed her mind about retaining the mobile home. These efforts, however, should have been *much* less intrusive and harassing than Defendant's skip tracing and telephone barrage in the fall of 2012. One or two calls, culminating in a voicemail message and/or a letter (both with the appropriate disclosures that Plaintiff had no obligation to make any payments, etc.), would have been reasonable. Defendant went way over the line that separates reasonable efforts to determine intent and enforce lien rights from prohibited, willful attempts to collect discharged debts.

Defendant's actions in October, 2012 are particularly egregious. Defendant should have

-10-

sent its notice of default/right to cure letter in early October, and followed up any failure to cure by exercising its state law remedy to repossess the mobile home. There is no possible justification for calling Plaintiff and her friends, neighbors, and relatives 134 times, leaving 60 messages. Defendant's actions make it clear that it had little or no interest in the mobile home, and believed its chances of recovery were much better if it hounded Plaintiff to make "voluntary" payments. Defendant went substantially too far in its collection efforts.

Defendant's activity also violated its own procedures. Defendant's procedure manual called for a maximum of one contact a month. Even this rate of contact likely is too frequent if the borrower is current on the voluntary payments, but in any event the limit was exceeded by Defendant 133 times in October, 2012. Defendant's argument that repeated calls and voicemails are not "contacts" is unpersuasive, given the targets (skip-traced family, friends, and neighbors), volume, and tenor of the calls and messages. Further, whether or not they are "contacts" as Defendant would define that term, they are prohibited dunning calls.

Defendant's procedure manual also instructs collectors to stop calling a customer if the customer asks them not to call back. Defendant's collectors did not comply with this procedure.

Finally, the procedure manual requires the collectors to bend over backwards to state and restate to borrowers like Plaintiff that they are not personally liable. The Court finds that the collectors in this case did not do that, but instead led Plaintiff to understand that she was "responsible" for making at least some payments.

Furthermore, even if Defendant's repeated calls were "facially permissible" because Defendant was simply enforcing its security interest, Defendant's conduct ran afoul of the discharge injunction under *Paul's* "objective test." Plaintiff has provided clear and convincing evidence that Defendant "acted in such a way as to 'coerce' or 'harass' the debtor improperly,"

-11-

i.e., so as to obtain payment of the discharged debt." *Paul,* 534 F.3d at 1307, citing and quoting *Pratt v. Gen. Motors Acceptance Corp. (In re Pratt),* 462 F.3d 14, 19 (1st Cir. 2006). Plaintiff's testimony and Defendant's collection log provide plain evidence of harassment, coercion, and resulting payment. Plaintiff's uncontradicted testimony about the tone and content of many of Defendant's telephone calls support this conclusion.

C. <u>APPROPRIATE SANCTION/DAMAGES</u>. "In cases in which the discharge injunction was violated willfully, courts have awarded debtors actual damages, punitive damages and attorney's fees." Collier on Bankruptcy (16th ed.) ¶ 524.02[2][c], citing *Hardy v. IRS (In re Hardy),* 97 F.3d 1384 (11th Cir. 1996); *In re Elias,* 98 B.R. 332 (N.D. Ill. 1989); *Cherry v. Arendall (In re Cherry),* 247 B.R. 176 (Bankr. E.D. Va. 2000); *In re Arnold,* 206 B.R. 560 (Bankr. N.D. Ala. 1997). *See also McGlynn v. Credit Store, Inc.,* 234 B.R. 576, 583 (D.R.I. 1999) (collecting cases); In the case of *In re Culley,* 347 B.R. 115 (10th Cir. BAP 2006) (unpublished), the Bankruptcy Appellate Panel for the Tenth Circuit upheld Judge Starzynski's award of actual damages, attorney fees, and punitive damages as a sanction for violating the discharge injunction. In doing so, the BAP followed *Diviney v. Nationsbank of Texas (In re Diviney),* 225 B.R. 762, 777 (10th Cir. BAP 1998), a case involving alleged violation of 11 U.S.C. § 362(a). The Court finds that Defendant's conduct violated the discharge injunction and was willful.

The Court concludes Plaintiff is entitled to actual damages and attorney fees. The actual damages proven at trial is the August, 2012 payment of $251, while the proven attorney fees total $5,700.

The Court also concludes that a punitive damage award of some amount is required in this case, given all of the facts in the record. Defendant knew better than to harass Plaintiff as it

did. This is particularly true given that Plaintiff had no obligation to Defendant. Had Plaintiff been more sophisticated, she likely would have stopped paying on the mobile home years ago, and forced Defendant to stop calling her. As it was, Defendant's treatment of Plaintiff and her friends and relatives in 2011 and 2012 was inexcusable. Based on the evidence, the Court believes $10,000 in punitive damages is reasonable and modest.

In sum, the Court will enter a money judgment in Plaintiff's favor as follows:

| | |
|---|---|
| Actual damages: | $ 251.00 |
| Attorney Fees: | $5,700.00 |
| Punitive Damages | $10,000.00 |
| Total: | $15,951.00 |

### III. CONCLUSION

Plaintiff carried her burden of proving by clear and convincing evidence that Defendant crossed the line and willfully violated the discharge injunction. The Court will grant Plaintiff a money judgment against Defendant in the amount, and for the reasons, set forth above. A separate judgment will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Date entered on docket: September 10, 2013.

Copies to:

Michael K. Daniels
P.O. Box 1640
Albuquerque, NM 87103

Christopher A. Holland
P.O. Box 1945
Albuquerque, NM 87103